**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**WAYNE CLARK YATES, JR.,**

    **Plaintiff,**

**v.**                                                              **3:05cv459/MCR/MD**

**WENDELL HALL, SHERIFF, SANTA
ROSA COUNTY, FLORIDA/SANTA ROSA
COUNTY SHERIFF'S OFFICE,**

    **Defendant.**
_____/

**O R D E R**

This case arises from the termination of plaintiff's employment as a detention deputy with the Santa Rosa County Sheriff's Office ("SRCSO"). Plaintiff has filed a two-count complaint under Title VII of the 1964 Civil Rights Act alleging race discrimination (Count I) and retaliation (Count II) in the Circuit Court of the First Judicial Circuit, in and for Santa Rosa County, Florida. Defendant removed the case to this court. Pending before the court is defendant's motion for summary judgment, to which plaintiff has responded.[1] For the reasons that follow, defendant's motion for summary judgment is GRANTED.

**Background**[2]

In August 2003, the plaintiff Wayne Clark Yates, a white male, applied for a position as a corrections officer with the Santa Rosa County Sheriff's Office (SRCSO).[3] Yates had

---

[1] Defendant has moved for summary judgment on both of plaintiff's claims. Plaintiff advises the court in his response that he "is not moving forward on his retaliation claim." The record does not support a claim for retaliation in this case and thus the court concludes that summary judgment is appropriate on this claim.

[2] As this case comes before the court on defendant's motion for summary judgment, the court views the following facts in the light most favorable to the plaintiff as the non-moving party. See Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993).

[3] Title VII prohibits discrimination in employment regardless of an employee's race. Bass v. Board of County Comm'rs, Orange County, Fla., 256 F.3d 1095, 1102-03 (citing McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 280, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976)). Further, the plaintiff's race has no impact on the court's analysis of his claim. Id. at 1103.

been a certified corrections officer since 1995.  Prior to his application for employment with the SRCSO, Yates had been employed by a number of different corrections agencies including the Florida Department of Corrections (DOC),[4] Corrections Corporation of America (CCA), and the Gadsden County Sheriff's Office (GCSO).  Yates was employed by the GCSO from January 2003 through August 2003, at which point he left to return to Escambia County.  At the time of Yates' application for employment with the SRCSO, and continuing through the events involved in this case, the SRCSO was directed by defendant, Sheriff Wendell Hall ("Hall"), also a white male.[5]

A background investigation was conducted as part of the SRCSO's consideration of Yates' application.  Captain Rosie Rogers, who conducted this investigation, contacted Yates' former employers to inquire about his past law enforcement employment.  When Rogers called the GCSO, she was informed that the officer responsible for personnel records, Captain Cecil Morris, was unavailable.  After leaving a message for Captain Morris, Captain Rogers proceeded to speak with Sergeant Derek Edwards, who had served as Yates' direct supervisor.  Sergeant Edwards gave Yates a favorable recommendation which Captain Rogers recorded and submitted to human resources on or about August 23, 2003.  After Captain Rogers' investigation of Yates' background was complete, jail administrator Major Dottie Way reviewed Yates' background file and approved him for hire.[6]  With Major Way's approval, Kimberly Scruggs, Human Resources Director for the SRCSO, extended to Yates a conditional offer of probationary appointment as a detention deputy contingent upon his successful completion of a medical examination,

---

[4] Yates worked for the DOC intermittently from 1996 through 2001.  During this time he worked at a number of different facilities within the DOC.  During his service at one DOC facility, Yates was accused of abuse of force by several inmates, but the allegations were not sustained.  Yates was eventually terminated by the DOC for writing a newspaper article which he denies writing.

[5] Sheriff Hall has served as the elected Sheriff of Santa Rosa County since January 2001.  In this capacity, Hall has the authority to hire and fire employees, subject to the provisions of Chapter 79-561, Laws of Florida, the Civil Service Act for Santa Rosa County.

[6] Major Way's race is not clear from the record.

Case No.: 3:05cv459/MCR/MD

drug screen, and background check.[7]

Yates began his employment with the SRCSO on September 8, 2003. As an employee of the SRCSO, Yates was subject to the Santa Rosa County Sheriff's General Order J-003 Disciplinary Guidelines and Standards ("General Order J-003"). General Order J-003 provides that all employees are subject to discipline for violating any of its requirements. Permanent employees can only be fired for just cause and are entitled to appeal any adverse actions to the county's Civil Service Board, which is vested with the authority to determine whether the Sheriff had just cause to suspend, demote, or terminate permanent employees. Permanent employees are those employees who have been employed "for a period of one year and [are] retained due to satisfactorily meeting all requirements of such employment." Because Yates was employed less than one year at the time of his termination, he was considered a probationary employee. Probationary employees are employed "at will" and can be terminated for any reason not unlawful, without notice or an opportunity to improve performance or opportunity to appeal the Sheriff's decision. General Order J-003 makes clear that the guidelines for discipline and disciplinary procedures only apply to permanent employees.

At some point between August 23, 2003 and September 11, 2003, Captain Morris of the GCSO returned Captain Rogers' phone call. Captain Morris suggested that Captain Rogers personally review Yates' GCSO file, which she did. After reviewing the file, Captain Rogers composed an additional background investigation report on September 11, 2003. This report indicated that Yates had been accused of excessive force on August 2, 2003, while working at the GCSO, and that he and another officer had been referred to the Pat Thomas Law Enforcement Academy for a refresher course in the proper use of force.[8] Captain Rogers gave the report to Janet Mosier, who was a human resources assistant for

---

[7] It is the policy of the SRCSO to "unhire" or withdraw an offer of employment if the background investigation raises questions as to an applicant's fitness for employment.

[8] In his deposition, Yates recalled that during his employment with the GCSO he had been questioned about his use of force against an inmate and had denied using excessive force. Yates also testified that he had not been told that he was to attend a refresher course in the proper use of force. Captain Rogers' report does not indicate whether Yates was ever informed of the decision to refer him to the Pat Thomas Law Enforcement Academy or whether he attended.

Case No.: 3:05cv459/MCR/MD

the SRCSO at the time. Mosier or another member of the human resources office placed the report in Yates' personnel file without first forwarding it to a supervisor for review.

Yates began his employment with the SRCSO as a detention deputy assigned to the inmate housing area of the Santa Rosa County Jail. In October 2003, one month after Yates began his employment with the SRCSO, Sergeant Joe Clark issued a documented verbal warning to Yates for allowing inmates to goad him into saying something to the effect of, "I get paid to watch you monkeys in a cage." Sergeant Clark advised Yates that such comments could be viewed as racially inappropriate.

By May 31, 2004, Plaintiff had been reassigned to the medical unit at the jail. On that day, William Countryman was arrested for a number of offenses, including resisting arrest with violence. The deputies who arrested Countryman had tased him and taken him to the ground. As a result, Countryman sustained an abrasion to his knee from the fall and burn welts on the back of his neck and on his forehead from the taser. Countryman was assigned to the medical unit due to his injuries and his admitted use of mind-altering drugs. Yates was not on duty when Countryman was brought to the medical unit but arrived later that evening for his shift.

On June 4, 2004, acting Jail Administrator Captain Rena Smith, a black female, received a telephone call from Countryman's father, whom she knew as a retired Escambia County corrections officer. Countryman's father asked if Countryman could call his cell phone using Captain Smith's office telephone. Captain Smith agreed and asked Sergeant Jimmy Cotton, a jail facility inspector and a white male, to accompany Countryman to the phone. Sergeant Cotton followed Captain Smith's orders and went to the medical unit to retrieve Countryman, whom he observed as having abrasions on his face and the back of his neck. Sergeant Cotton escorted Countryman to the phone before returning to the medical unit to get some coffee.

When Sergeant Cotton returned to the medical unit, Yates was working and he and Sergeant Cotton had a conversation, the content of which is disputed. Yates maintains that his conversation with Sergeant Cotton was very brief. He stated in his deposition that Sergeant Cotton declared that Countryman was crazy and Yates agreed. Yates testified that Sergeant Cotton then left to get Countryman and return him to the medical unit.

Sergeant Cotton, however, describes a very different conversation.[9] Sergeant Cotton stated that when he returned to the medical unit he asked Yates what had happened to Countryman. Yates responded by asking Sergeant Cotton if he could tell him something and not get in trouble. Sergeant Cotton responded that he did not want Yates to tell him things that would get Yates into trouble. Yates, nonetheless, proceeded to tell Cotton that he had hit Countryman "harder than he had ever hit any man in his life." Yates recounted to Cotton that one of the nurses had been asked to attend to an inmate who was having a panic attack. Yates went to open the door, but Countryman was in the way and would not move, so Yates "cured" him of his problem. Yates further stated that he had hit Countryman so hard that he had knocked out one of his teeth. After making these statements, Yates later told Cotton that he had just been joking about hitting Countryman. Before Cotton left, however, Yates again admitted that he had in fact hit Countryman.[10]

After returning Countryman to the medical unit, Sergeant Cotton reported to Lieutenant Paul Campbell, his direct supervisor and a white male, that Yates had admitted to hitting Countryman. Based on Sergeant Cotton's description of Yates' admission, Lieutenant Campbell believed that Captain Smith needed to be informed about what had happened. Both Sergeant Cotton and Lieutenant Campbell met with Captain Smith and Cotton repeated what Yates had said to him. Sergeant Cotton also noted that Countryman seemed very intimidated by Yates and would not speak in his presence. Based on Sergeant Cotton's allegations, Captain Smith instructed Cotton and Lieutenant Campbell to interview Countryman about what had happened. She also instructed that they have a detective present from the Major Crimes Unit in case any criminal violations had occurred.

Sergeant Cotton and Lieutenant Campbell acted on Smith's instructions and met Countryman in an interview room away from the medical unit. Also present was Major Crimes Unit Detective Larry Tynes, a white male. Tynes, however, did not ask any

---

[9] Sergeant Cotton's version of the events was recorded in a memorandum to Captain Rena Smith. Sergeant Cotton also testified to these events at his deposition.

[10] As this case comes before the court on defendant's motion for summary judgment, the court must view the facts in the light most favorable to the plaintiff and thus for purposes of this order, the court accepts the plaintiff's version of Yates' and Cotton's conversation.

Case No.: 3:05cv459/MCR/MD

questions and was not officially assigned to the case. During this interview, Countryman confirmed that he had been hit by an officer on the night he was arrested and that it had knocked his tooth out. As proof, Countryman showed Sergeant Cotton and Lieutenant Campbell where one of his upper teeth was broken near the gum line.[11] When asked to indicate which officer had hit him, Countryman responded that it was the "big one back there." Sergeant Cotton and Lieutenant Campbell believed that Countryman was alluding to Yates because Countryman's statements were consistent with what Yates had previously told Cotton and because Yates was a large man.[12] Countryman never specifically identified Yates by name, however.

After meeting with Countryman, Sergeant Cotton and Lieutenant Campbell reported back to Captain Smith. Captain Smith then called Major Keith Morris, the director of administration at the SRCSO and second in command of the office, and advised him of what she had learned. Captain Smith suggested that Yates be placed on administrative leave with pay. Major Morris approved Captain Smith's suggestion and Yates was placed on paid administrative leave, effective that day, June 4, 2004.

Later that day, Sheriff Hall learned of the alleged incident between Yates and Countryman. He instructed Captain Smith to conduct a supervisory inquiry in order to determine what actions should be taken.[13] Based on Sheriff Hall's instructions, Smith asked Cotton and Campbell to both write reports about what they had heard and seen. Smith also spoke to Nurse Susan Hedman to determine Countryman's physical condition when he was admitted to the medical unit and the condition of Countryman's tooth.[14]

---

[11] On June 8, 2004, a human tooth was found in the medical unit. Subsequent DNA testing confirmed that the tooth was William Countryman's.

[12] At the time, Yates was 6'4'' and weighed 240 pounds.

[13] Sheriff Hall testified at his deposition that during a supervisory inquiry, the immediate supervisor of the deputy under review investigates the allegations and brings the findings to the Sheriff who then decides whether to do an internal investigation or take other appropriate action. General Order J-003(I)(F)(1) further states that "[w]henever a supervisor receives a complaint regarding a member, the supervisor is authorized to conduct a preliminary review of the facts to determine whether a formal investigation should be initiated."

[14] Nurse Hedman believed Countryman's tooth was chipped when he was first admitted to the medical unit. By June 4, 2004, however, she observed that the tooth had been broken off completely.

Captain Smith then collected Cotton and Campbell's reports and submitted them to Major Morris for review. She also recounted what she had learned from Nurse Hedman. She recommended to Major Morris that an internal affairs investigation be conducted into the matter, but made no recommendation as to the discipline Yates should receive.[15]

Major Morris reviewed Captain Smith's report and shared the findings with Sheriff Hall. Hall directed Major Morris to contact Captain Woody Seevers and have him conduct a criminal investigation into the matter. Captain Seevers directed Lieutenant Hank Shirah to assign Detective Tynes to the case, which he did on June 8, 2004. Major Morris also retrieved plaintiff's personnel file and brought it along with Captain Smith's report to Major Way's home for her to review.[16] While reviewing Yates' file, Major Way saw for the first time Captain Rogers' additional background investigation report of September 11, 2003, documenting that Yates had previously been accused of excessive force while working with the GCSO. Based on Captain Rogers' report, Sergeant Cotton's allegations, and the fact that Yates was still only a probationary officer, Major Way recommended that Yates' employment be terminated.[17] Major Morris agreed with Major Way's recommendation and discussed terminating Yates' employment with Sheriff Hall. Sheriff Hall considered Major Way's and Major Morris' recommendations as well as the results of Captain Smith's supervisory inquiry and decided to terminate Yates' employment based on his belief that Yates was a potential liability to the SRCSO.[18]

On June 10, 2004, Major Morris informed Captain Smith that Sheriff Hall had authorized Yates' termination. Captain Smith contacted Yates and asked him to come to her office. Smith's meeting with Yates was attended by Lieutenant Dee Hobbs and Lieutenant Jerry Ranger. During the meeting Smith advised Yates that he was being terminated for using excessive force. Yates protested that he had not hit Countryman and

---

[15] No internal affairs investigation was ever performed.

[16] Major Way was currently on medical leave from the SRCSO as she recovered from an injury.

[17] Major Way further stated in her deposition that she would not have recommended Yates' initial offer of employment had she known about Captain Rogers' report at that time.

[18] Sheriff Hall makes the final decision on all terminations in the SRCSO.

had not said anything to that effect to Sergeant Cotton. The notice of separation signed by Sheriff Hall and Captain Smith indicated that the reason for the separation was Yates' misuse of force against an inmate. Yates refused to sign the notice of separation.

After Yates was terminated, the criminal investigation continued under the direction of detective Larry Tynes. On June 21, 2004, Tynes reported his conclusion that the charges against Yates were unfounded.[19] In July 2004, Yates asked to meet with Sheriff Hall. At this meeting, Yates offered to take a lie detector test to show his innocence. Sheriff Hall initially agreed, but later changed his mind and the test was never administered. Finally, General Counsel Hal Johnson of the Police Benevolent Association called Sheriff Hall in October 2004 and asked if anything could be done on Yates' behalf. After this conversation, Sheriff Hall issued an amended notice of separation that indicated as the reason for termination "Failure to Meet Performance Standards."

Later that year, after Yates' termination, another detention deputy at the SRCSO, Shawn Frasier, was accused of the use of excessive force on an inmate. Frasier, who is a black male, had been employed by the SRCSO since July 2000.[20] On November 26, 2004, Frasier was on duty at a state correctional institution (part of the DOC) when he injured inmate Donald Glenn while attempting to restrain him.[21] Glenn was hospitalized as a result of Frasier's actions. The incident was recorded by one of the jail's surveillance video cameras. The officer in charge at the time, Lieutenant Patricia Killam, contacted Captain Smith who then contacted Major Way.[22] Captain Smith recommended to Major Way that Frasier be placed on administrative leave and that a major crimes investigation

---

[19] As part of his investigation, Tynes spoke with inmate Countryman on June 21, 2004. Countryman retracted his allegation that he had been punched by a detention deputy. Detective Tynes' reported his findings to the State Attorney's Office, which declined to bring criminal charges against Yates.

[20] As Frasier had been employed by the SRCSO for more than a year, he was considered a permanent employee. Until this time, Frasier had never been the subject of any disciplinary action or internal investigation.

[21] Frasier and a number of Santa Rosa County Jail inmates were housed at the Santa Rosa Correctional Institution due to damage to the jail during Hurricane Ivan.

[22] By the time of the incident involving Frasier and inmate Glenn, Major Way had returned to the SRCSO from her medical leave and was serving as jail administrator. Captain Smith had been acting jail administrator during Major Way's absence.

Case No.: 3:05cv459/MCR/MD

be conducted. Major Way, however, decided not to conduct a major crimes investigation or place Frasier on administrative leave and instead directed that he be transferred to the Santa Rosa County Jail, away from inmate Glenn. In lieu of a major crimes investigation, Major Way directed Captain Smith to have Lieutenant Killam conduct a supervisory inquiry into the matter. Captain Smith suggested that Lieutenant Campbell be assigned to investigate the matter as he was a facility inspector and was not Frasier's direct supervisor. Major Way agreed and Lieutenant Campbell began an initial investigation. On December 14, 2004, however, Sheriff Hall directed an internal affairs investigation be conducted and assigned the case to Lieutenant Campbell. Sheriff Hall also provided the surveillance video of the altercation to the State Attorney's Office to determine if criminal charges should be brought against Frasier. The State Attorney's Office reviewed the videotape and determined that no criminal conduct had occurred.

Lieutenant Campbell completed his internal investigation and submitted his findings to Major Way and Director Morris[23]. Both agreed that the allegations of excessive use of force had been substantiated. Under General Order J-003, the recommended discipline for a first offense violation of the excessive use of force policy resulting in the need for medical treatment is a ten day suspension without pay. Major Way, Lieutenant Killam, and Director Morris, however, recommended that Frasier be terminated because, in their view, the investigation, including the surveillance videotape, showed that Frasier had not only used excessive force but had also been untruthful in describing how the incident occurred.[24] Sheriff Hall agreed with the recommendation and Frasier was placed on administrative leave as of March 15, 2005, and terminated on March 25, 2005.

**Legal Standard**

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, show that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265

---

[23] Major Keith Morris had been promoted to director after Yates was fired.

[24] The disciplinary guidelines in General Order J-003 recommend termination for even a first violation of untruthfulness in an official proceeding.

Case No.: 3:05cv459/MCR/MD

(1986).  "The mere existence of *some* alleged factual dispute between the parties," however, "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986) (emphasis in original).  A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  A fact is "material" if it may affect the outcome of the case under the applicable substantive law.  See id.

When a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the adverse party may not rest on the mere allegations or denials of the moving party's pleadings.  Instead, the nonmoving party must respond by affidavits or otherwise and present specific allegations showing that there is a genuine issue of disputed fact for trial.  Fed. R. Civ. P. 56(e).  When assessing the sufficiency of the evidence, the court must view all the evidence, and all factual inferences reasonably drawn therefrom, in the light most favorable to the nonmoving party.  See Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993).  A mere scintilla of evidence in support of the nonmoving party's position will not suffice to demonstrate a genuine issue of material fact and thereby preclude summary judgment.  See Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the adverse party fails to show a genuine issue of material fact, summary judgment, if appropriate, may be entered against the nonmoving party.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff can establish a claim for employment discrimination through the use of direct, circumstantial, or statistical evidence.  Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).[25]  In cases where a plaintiff relies on circumstantial evidence, the claim is evaluated using the three-step framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)

---

[25] In this case, plaintiff seeks to establish his claim based on circumstantial evidence only.

Case No.: 3:05cv459/MCR/MD

and Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Under this framework, plaintiff has the initial burden of establishing a prima facie case of discrimination, thus creating a rebuttable presumption that an employer acted unlawfully. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004). To establish a prima facie case, a plaintiff must show that: "(1) he belongs to a protected class; (2) he was subjected to [an] adverse job action; (3) his employer treated similarly situated employees outside his classification more favorably; and (4) he was qualified to do the job." Maniccia v. Brown, 171 F.3d 1356, 1368 (11th Cir. 1999) (citing Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997); Nix v. WLCY Radio/Rahall Comms., 738 F.2d 1181, 1185 (11th Cir. 1984); McDonnell Douglas, 411 U.S. at 804). The Eleventh Circuit has noted, however, that the method of establishing a prima facie case is not fixed, but rather is flexible and dependent on the employment situation. Wilson, 376 F.3d at 1087 (citing Nix, 738 F.2d at 1185). Should a plaintiff fail to establish a prima facie case using the four factors in Maniccia, summary judgment is warranted if there is no other evidence of discrimination. Holifield, 115 F.3d at 1562 (citing Mack v. Great Atlantic and Pacific Tea Co., 871 F.2d 179, 182 (1st Cir. 1989)). The standard for demonstrating a prima facie case, however, is not onerous, requiring "only that the plaintiff establish facts adequate to permit an inference of discrimination." Id. (citing Williams v. Ford Motor Co., 14 F.3d 1305, 1308 (8th Cir. 1994); Burdine, 450 U.S. at 253-54).

Once a plaintiff has established a prima facie case using the factors in Maniccia or shown some other evidence of discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment decision. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824.[26] This justification should be "clear, reasonably specific, and worthy of credence." Hall v. Ala. Ass'n of Sch. Bds., 326 F.3d 1157, 1166 (11th Cir. 2003). The employer, however, need not persuade the court that it was actually motivated by the proffered reason. Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997) (quoting Burdine, 450 U.S. at 254, 101 S.Ct. at 1094). Thus, the defendant's burden is one of production, not persuasion. Wilson, 376 F.3d at 1087-88.

---

[26] Only the burden of production shifts to the defendant. The burden of persuasion always remains with the plaintiff. Wilson, 376 F.3d at 1088 (quoting Burdine, 450 U.S. at 253).

The Eleventh Circuit has stated that this burden is "exceedingly light." Holifield, 115 F.3d at 1564 (quoting Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994)).

Once the employer satisfies its burden of production by articulating one or more legitimate, nondiscriminatory reasons for its action, the presumption of discrimination is eliminated and the burden of production shifts back to the plaintiff to offer evidence that the alleged reason is a pretext for illegal discrimination. Wilson, 376 F.3d at 1087. The plaintiff can satisfy this requirement either directly by "persuading the court that a discriminatory reason more than likely motivated the employer" or indirectly by "persuading the court that the proffered reason for the employment decision is not worthy of belief." Hall, 326 F.3d at 1166. Where the employer offers multiple reasons for its decision, the plaintiff must produce sufficient evidence for a reasonable fact finder to conclude that each reason is pretextual. Chapman v. AI Transport, 229 F.3d 1012, 1037 (11th Cir. 2000).

A plaintiff can establish that an employer's reasons are pretextual by showing "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" Cooper v. Southern Co., 390 F.3d 695, 725 (11th Cir. 2004) (quoting Combs, 106 F.3d at 1538). Plaintiff, however, "cannot succeed by simply quarreling with the wisdom of that reason." Chapman, 229 F.3d at 1030 (quoting Alexander v. Fulton County, Ga., 207 F.3d 1303, 1341 (11th Cir. 2000) and citing Combs, 106 F.3d at 1541-43). A plaintiff does not establish pretext by arguing that the defendant's decision was mistaken. See Wilson, 376 F.3d at 1092 (quoting Lee v. GTE Florida, Inc., 226 F.3d 1249, 1253 (11th Cir. 2000)). Rather he must show that the decision was motivated by the plaintiff's race. Id. Title VII allows employers to terminate an employee for "a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Nix, 738 F.2d at 1187.

Finally, despite the shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Wilson, 376 F.3d at 1088 (quoting Burdine, 450 U.S. at 253, 101 S.Ct. at 1093, 1095). Because of this, even though a plaintiff may establish a prima

facie case and set forth sufficient evidence to reject the defendant's explanation, if no rational factfinder could conclude that the employer's action was discriminatory, then summary judgment may be warranted. Chapman, 229 F.3d at 1025 n.11 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148, 120 S.Ct. 2097, 2109, 147 L.Ed.2d 105 (2000)).

**Discussion**

In this case, defendant, Sheriff Hall, argues that summary judgment is appropriate because (1) plaintiff has not established a prima facie case because he has not identified a similarly situated employee who was treated more favorably and plaintiff was not qualified for his position, and (2) even if plaintiff could establish a prima facie case, defendant has presented a legitimate, non-discriminatory reason for terminating the plaintiff's employment and plaintiff cannot establish that this reason was pretextual. Plaintiff counters that (1) he has established a prima facie case for race discrimination by identifying Deputy Shawn Frasier as a more favorably treated, similarly situated employee and plaintiff was qualified for his position, (2) even if Frasier is not similarly situated, plaintiff has put forward other evidence of discrimination to establish a prima facie case, and (3) while plaintiff agrees that defendant has put forward a legitimate, non-discriminatory reason for terminating his employment, the plaintiff has sufficiently established that this reason was a pretext for racial discrimination. In ruling on defendant's motion for summary judgment, the court must decide if there is any genuine factual dispute on the issues of whether plaintiff and Deputy Frasier were similarly situated and whether defendant's decision for terminating plaintiff's employment was pretextual.[27]

### A. Plaintiff's Prima Facie Case

In order to establish a prima facie case of race discrimination, a plaintiff "must show that his employer treated similarly situated employees outside his classification more

---

[27] Plaintiff and defendant agree that plaintiff has sufficiently stated the first two elements of the Maniccia prima facie test. Defendant, however, argues that plaintiff has failed to establish the fourth element as he was not qualified for his position because he physically struck an inmate and had previously been accused of excessive use of force. As this issue is inherently intertwined with the issue of whether plaintiff's termination was pretextual, it is more appropriately considered as part of that stage of the McDonnell Douglas framework. See Holifield, 115 F.3d at 1562 n.3 (citing Anderson v. Baxter Healthcare Corp., 13 F3d 1120, 1124 n.4 (7th Cir. 1994); Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3d Cir. 1990)).

Case No.: 3:05cv459/MCR/MD

favorably." Holifield, 115 F.3d at 1562 (citing Coutu v. Martin Cty. Bed. Of Cty. Commissioners, 47 F.3d 1068, 1073 (11th Cir. 1995). The comparator employee(s) must be similarly situated to the plaintiff "in all relevant respects." Id. (citing Smith v. Stratus Computer, Inc., 40 F.3d 11, 17 (1st Cir. 1994); Mitchell v. Toledo Hospital, 964 F.2d 577, 583 (6th Cir. 1992); Smith v. Monsanto Chemical Co., 770 F.2d 719, 723 (8th Cir. 1985)). In analyzing whether employees are similarly situated when the questioned adverse action is one of discipline the court must "'consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.'" Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311 (11th Cir.), opinion modified by 151 F.3d 1321 (11th Cir. 1998) (quoting Holifield, 115 F.3d at 1562). Courts, however, are reminded that, "'Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules.'" Maniccia, 171 F.3d at 1369 (quoting Jones 137 F.3d at 1311); see also Nix, 738 F.2d at 1187. Therefore, "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges," the similarly situated comparator's misconduct must be "nearly identical" in "quantity and quality." Maniccia, 171 F.3d at 1368-69 (citing Dartmouth Review v. Dartmouth College, 889 F.2d 13, 19 (1st Cir. 1989)).[28]

In this case, Yates argues that Deputy Frasier was a similarly situated employee who was treated more favorably by the defendant because, like Yates, Frasier was also accused of excessive use of force but he was not terminated on this basis.[29] Further, Yates argues that Frasier was granted an internal affairs investigation while Yates was not; Frasier was not subject to a major crimes investigation while Yates was; and Frasier was simply reassigned during his investigation while Yates was placed on administrative leave.

---

[28] There is an intra-circuit conflict over the question of whether the comparator's conduct must be "nearly identical" or just "similar" to the plaintiff's. Compare Maniccia, 171 F.3d at 1368-69, with Alexander v. Fulton County, Ga., 207 F.3d 1303, 1334 (11th Cir. 2000) ("[T]he law only requires 'similar' misconduct from the similarly situated comparator."). Because Maniccia pre-dates Alexander, Maniccia is the law in this circuit and the case this court is bound to follow. See Burke-Fowler v. Orange County, 447 F.3d 1319, 1323 n. 2 (11th Cir. 2006).

[29] Although terminated following an official investigation into allegations that he engaged in the use of excessive force against an inmate, the documented reason for Frasier's termination was his untruthfulness during the investigation.

Case No.: 3:05cv459/MCR/MD

Defendant, however, argues that Yates and Deputy Frasier cannot be similarly situated because they do not have the same employment status and because Yates had previously been accused of excessive use of force, while Deputy Frasier had not.

At the prima facie case stage of a wrongful termination claim, "the comparison between employees should not focus on job status . . . ." Moore v. State of Alabama, 989 F.Supp. 1412, 1419 n.6 (M.D. Ala. 1997), aff'd, 178 F.3d 1303 (11th Cir. 1999) (citing Rohde v. K.O. Steel Castings, Inc., 649 F.2d 317, 322 (5th Cir. Unit A June 1981)); see also Derasmo v. City of Gainesville, 1998 WL 798639 (N.D. Fla. 1998) (recognizing that probationary and permanent employees are considered similarly situated if they are accused of the same offense and treated differently). Such a distinction may bear on the defendant's legitimate reasons for its actions and the difference in the treatment of the two employees, but it "should not defeat a prima facie case." Rohde, 649 F.2d at 322. For the purpose of establishing a prima facie case, "'[w]hat is relevant is that two employees are involved in or accused of the same offense and are disciplined in different ways.'" Pearson v. Macon-Bibb County Hosp. Authority, 952 F.2d 1274, 1280 (11th Cir. 1992) (quoting Rhode, 649 F.2d at 322).[30] Here, Yates and Frasier engaged in nearly identical conduct by using excessive force against an inmate. Yates and Frasier, however, received different discipline for their conduct. While Yates was terminated, Frasier was not. Instead, Frasier was later terminated because he had been untruthful during the SRCSO's investigation into his conduct. Therefore, the court finds that Yates has presented sufficient evidence to raise an issue of material fact as to whether Yates and Frasier were similarly situated and thus has established a prima facie case to survive summary judgment.

### C. Pretext

As plaintiff has established a prima facie case of racial discrimination, the burden shifts to the defendant to present a legitimate, non-discriminatory reason for his action. McDonnell Douglas, 411 U.S. at 802. In this case, the evidence supports two legitimate,

---

[30] The court notes that other circuits have considered job status in deciding whether employees were similarly situated and have found that probationary employees are not similarly situated to permanent employees. Steinhauer v. DeGolier, 359 F.3d 481, 484 (7th Cir. 2004) (citing Bogren v. Minnesota, 236 F.3d 399, 405 (8th Cir. 2000); McKenna v. Weinberger, 729 F.2d 783, 789 (D.C. Cir. 1984)). This does not appear to be the law in the Eleventh Circuit. See Rohde v. K.O. Steel Castings, Inc., 649 F.2d 317, 322 (5th Cir. Unit A June 1981).

Case No.: 3:05cv459/MCR/MD

non-discriminatory reasons for Sheriff Hall's decision to terminate Yates' employment: (1) he believed that Yates had physically struck Countryman because Yates admitted as much to Sergeant Cotton and thus Yates engaged in unsatisfactory performance during his probationary period and (2) he agreed with Major Way's recommendation that Yates' be terminated in part because of the prior allegations of excessive use of force in Yates' employment history.[31]  The court finds and plaintiff does not dispute that these are legitimate, non-discriminatory reasons that satisfy defendant's burden.  Having presented legitimate, non-discriminatory reasons for terminating Yates' employment, the burden of production shifts back to the plaintiff to establish an issue of material fact as to whether Sheriff Hall's reasons were a pretext for unlawful discrimination. Wilson, 376 F.3d at 1087.

The court finds that Yates has not presented sufficient evidence to show that Sheriff Hall's reasons for terminating him were pretextual.  First, Yates offers no support for his argument that Sheriff Hall could not have believed that Yates had hit Countryman.  Sheriff Hall testified that he believed what Sergeant Cotton told him about Yates admitting to having struck Countryman and plaintiff has offered nothing to question Sheriff Hall's decision to believe Cotton in this regard.[32]  There is no issue of Cotton's credibility appearing anywhere in the record.  To the contrary, at the time, Sergeant Cotton had been employed with the SRCSO for ten years and apparently had a clean record.[33]  As the employer, Sheriff Hall was well within his prerogative to believe a sergeant with ten years of experience in the department over a newly hired detention deputy who had twice previously been accused of excessive use of force and who had recently been reprimanded by the SRCSO for allowing inmates to goad him into losing control of his temper.  No jury could reasonably conclude otherwise.  Moreover, it was Sheriff Hall's

---

[31] Yates had been accused of excessive use of force during his employment with the Florida DOC and the GCSO.  He had also been counseled, within one month of beginning his employment with the SRCSO, about making racially charged remarks to inmates. See supra p. 4.

[32] Much of plaintiff's argument in his response concerns his belief that a deputy named Wade Jarvis actually hit Countryman.  He further argues that Sergeant Cotton was Wade Jarvis' supervisor.  There is no competent evidence in the record, however, that supports the inference that Sergeant Cotton falsely accused Yates in order to protect Wade Jarvis.

[33] There is no evidence that during Sergeant Cotton's employment with the SRCSO he has ever been untruthful or the subject of discipline.

Case No.: 3:05cv459/MCR/MD

prerogative as the employer to choose to accept the recommendation of Major Way to terminate Yates. Major Way stated in deposition that regardless of the incident with Countryman she would not have recommended Yates for hire had she known about the past allegation of excessive use of force at the GCSO. Plaintiff has not cast any doubt on Major Way's testimony in this regard.[34]

In addition, Yates' arguments that defendant Hall's decisions were pretextual because of the suspect procedures the SRCSO employed in making the decision to terminate his employment are similarly unavailing. While the record does show that Yates was not afforded an internal affairs investigation and Frasier was, there is no evidence in the record to show that Sheriff Hall is required to conduct an internal affairs investigation for probationary employees. The record shows on the contrary that in the five years that Hall has been Sheriff, he has only ordered one internal affairs investigation of a probationary employee and that occurred within the first week of his term as sheriff. Further, while Sheriff Hall did not conduct a major crimes investigation into Frasier's actions, the record is clear that the purpose of a major crimes investigation is to help the State Attorney's Office decide whether any criminal violations have occurred. In Frasier's case, once the State Attorney's Office reviewed the videotape of Frasier's actions and decided that no criminal conduct had occurred there was no need for a major crimes investigation. Also, Sheriff Hall had no reason to wait for the conclusion of Yates' major crimes investigation before terminating his employment. The purpose of the investigation was to determine whether criminal conduct had occurred, not whether Yates had failed to meet performance standards and his "at will" employment should be ended.

Most importantly, the undisputed evidence shows that Sheriff Hall adhered to the disciplinary requirements of General Order J-003 as to both Yates and Deputy Frasier. Frasier was initially accused of violating the standard prohibiting excessive use of force requiring medical treatment (Standard 034), which is a level four violation. The recommended discipline for the first occurrence of a level four violation is a three to ten day

---

[34] While plaintiff argued in his response that Major Morris had previous knowledge of Captain Rogers' supplemental background report of September 11, 2003 and thus the report could not have formed the basis of Sheriff Hall's decision to terminate Yates' employment, plaintiff has since withdrawn this argument. See doc. 46.

suspension without pay. Sheriff Hall properly imposed the maximum recommended discipline: Frasier was suspended for ten days without pay. Frasier also requested and received a predetermination conference.[35] The conclusion of those in charge at the conference was that in addition to using excessive force Frasier had been untruthful in an official proceeding. Untruthfulness in an official proceeding (Standard 037) is a level five violation. The recommended discipline for a first occurrence of a level five violation is dismissal. Based on this subsequent determination of a level five violation, Sheriff Hall again followed the guidelines and imposed the recommended discipline: dismissal.

Probationary employees like Yates, however, are treated as "at will" employees who can be fired for any reason so long as it is not an unlawful one. General Order J-003 provides for the termination of probationary employees without notice or an opportunity to improve performance. Thus, while Yates may have been treated differently than Frasier the reason for the differential treatment was not based on race, but rather on the dictates of the Sheriff's office policies.[36] The undisputed evidence shows that Sheriff Hall conformed to the disciplinary guidelines for both employees based on their respective employment status in the department.[37]

---

[35] All permanent employees are allowed to request a pre-determination conference in order to contest any proposed disciplinary action involving a suspension of more than five working days, a reduction in pay, a demotion, or a dismissal.

[36] Plaintiff's argument that Sheriff Hall had the discretion to impose discipline outside the guidelines is irrelevant. There is no evidence that Sheriff Hall has departed from the guidelines under similar circumstances with an employee outside plaintiff's protected class.

[37] Plaintiff's complaint does not allege that Sheriff Hall himself discriminated on the basis of race, but rather that "African American employees of Defendant made and/or recommended employment decisions adversely affecting Plaintiff" and that Hall "condoned and ratified" the actions of his agents, which "were of a race based nature." (Doc. 1, ¶¶ 7, 13). Captain Rena Smith is the only employee Yates claims acted in a racially discriminatory manner. Captain Smith, however, recommended the exact same procedure for both Yates and Frasier: a major crimes investigation and an internal affairs investigation. The decision to perform a major crimes investigation in Yates' case and an internal affairs investigation in Frasier's case was made higher up the chain of command. Further, plaintiff has put forward no evidence to dispute Captain Smith's testimony that she did not make any recommendation as to plaintiff's firing, and no evidence to dispute that the recommendation to terminate Yates came from Major Morris and Major Way. See Holifield, 11 F.3d at 1563-64 ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case.'") (quoting Medina-Munoz v. R.J. Reynolds Tobacco, Co., 896 F.2d 5, 10 (1st Cir. 1990) and citing LaMontagne v. American Convenience Products, Inc., 750 F.2d 1405, 1412 (7th Cir. 1984)).

Case No.: 3:05cv459/MCR/MD

**Conclusion**

      The record reflects plaintiff's dissatisfaction with Sheriff Hall's decision to terminate him and his belief that he was treated unfairly in the process.  In sum, plaintiff questions the wisdom and prudence of Sheriff Hall's decision.  The law, however, does not support such challenges to an employer's decisions.  Courts are "not in the business of adjudging whether employment decisions are prudent or fair.  Instead our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."  Lee, 226 F.3d at 1253 (quoting Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1361 (11th Cir. 1999)).  The record is devoid of any evidence that Sheriff Hall's decision to terminate Yates was a pretext for an underlying racially discriminatory motive. Yates' claim for racial discrimination, therefore, cannot proceed and summary judgment is warranted.

      Plaintiff's Title VII claim fails because there is no evidence in the record to show that defendant's decision to terminate his employment was motivated by race.

      Accordingly, it is hereby ordered:

1. Defendant's motion for summary judgment (doc. 27) is GRANTED as to both Counts I and II; and
2. Final judgment is entered in favor of the defendant, with taxable costs assessed against plaintiff.  Plaintiff shall take nothing by this action.  The Clerk of Court is directed to CLOSE this case.

**DONE AND ORDERED** on this 30th day of March 2007.

                              *s/ M. Casey Rodgers*
                              **M. CASEY RODGERS**
                              **UNITED STATES DISTRICT JUDGE**